UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MARY VISCUSI, *pro se*,                         :
                                                :
                              Plaintiff,        :          **MEMORANDUM & ORDER**
                                                :
              -against-                         :          05-CV-01528 (DLI)(LB)
                                                :     ⎯
PROCTOR & GAMBLE,                               :
                                                :
                              Defendant.        :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Mary Viscusi brings this diversity action against defendant P&G – Clairol, Inc.

("Clairol"), improperly named herein as "Proctor & Gamble," for personal injuries she allegedly

sustained after applying Clairol Nice 'N Easy "Natural Black" hair dye ("the product") to her hair

on March 30, 2002. Ms. Viscusi appears to raise claims of negligence, strict product liability and

breach of warranty. Clairol has moved to exclude the testimony of plaintiff's proffered expert, and

also for summary judgment. For the reasons set forth below, defendant's motions are granted.

**Background**

1. <u>The Incident</u>

On March 30, 2002, plaintiff applied the product to her hair, allegedly "using the instructions

inside the box." (Wydysh Aff. Ex. E, Answers to Def.'s First Interrogs. to Pl., ¶ 3.) The instructions

provided with the product instruct the user to perform an "allergy test" forty-eight hours prior to

using the product: "Just as some people are allergic to foods and medicines, a small number of

people may show an allergic reaction to hair colorants. So, to help minimize your risk, it is

important to perform the skin allergy test 48 hours prior to **every** application." (Wydysh Aff. Ex.

H) (emphasis in original.)  To perform the allergy test, mix a small amount of the product (ColorSeal Activating Cream and ColorSeal Formula), apply it to the inside of the elbow, allow it to dry, do not wash the site for forty-eight hours, and examine the site after forty-eight hours to see if there has been a reaction.  (*Id*.)  "If no reaction occurs, you are ready to color.  **If a rash or redness, burning or itching occurs you may be allergic and you must not use this product**."  (*Id*) (emphasis in original.)

Plaintiff claims to have performed the allergy test, as set forth in the instructions, at approximately 9:00 a.m. on March 28, 2002.  (Wydysh Aff. Ex. E ¶ 10.)  Plaintiff did not suffer an allergic reaction during the forty-eight hours following the test, and felt no physical discomfort during the twenty-five minutes the product remained in her hair.  (Wydysh Aff. Ex. F, Viscusi Dep. 20: 10-14, 21: 7-18, 25: 20-22, Mar. 7, 2006.)  However, plaintiff first felt discomfort around 12:00 a.m. on the morning of March 31, 2002, approximately fifteen hours after plaintiff had rinsed the product out of her hair.  (*Id*. at 33: 6-23.)  When plaintiff awoke later that morning, her scalp was "burning and itching," and her face was "swollen and red blisters and sores [were] evident on plaintiff's face and neck."  (Wydysh Aff. Ex. E ¶ 15.)  After using the product, plaintiff discarded the package and the remaining ingredients.  (Wydysh Aff. Ex. F 16: 12-20.)

2.   The Product

According to Dr. Marvin Kaminsky, a professional toxicologist, the product contains p-phenylenediamine, n, n, - bis(2-hydroxyethyl)-p-phenylenediamine, and other conventionally used cosmetic hair dye excipients.  (Kaminsky Aff. ¶¶ 9, 21(d).)  Although the colorants contained in the product have a history of safe use by consumers, as contact dermal allergens, they may cause contact dermatitis in a small percentage of persons.  (*Id*. at ¶ 10.)  For instance, out of the 24,508,300 units

of Clairol Nice 'N Easy sold in 2001, (Fritz Aff. ¶ 4), Clairol received 665 consumer reports of alleged allergic reactions following the use of the product, none of which have been medically verified by defendant. (Schlosser Aff. ¶¶ 5, 6.) Clairol, however, received no consumer reports of "nerve ending damage" following the use of the product in 2001. (*Id*. at ¶ 7.)

3.    Medical Treatment

On April 14, 2002, fourteen days after plaintiff's symptoms allegedly began, plaintiff went to the emergency room at Parkway Hospital seeking treatment for "severe [heart] palpitations," not for complaints concerning her scalp. (Wydysh Aff. Ex. F 37: 22-25, 38: 2-3.) Parkway Hospital's "final diagnosis" was that plaintiff suffered from "anxiety disorder." (Wydysh Aff. Ex. I.) Plaintiff was treated with Xanax, an anti-axiety agent, and released. (*Id*.)

Plaintiff began treating with Dr. Dmitry Khasak, a dermatologist, on April 16, 2002. In his office note dated April 25, 2002, Dr. Khasak's "assessment" was that plaintiff suffered from "psychomatic Sx's [symptoms]" and "mild D [depression]." (Wydysh Aff. Ex. J.) Dr. Khasak further noted on May 2, 2002 that plaintiff was "very anxious . . . displays sudden crying spells," and on May 7, 2002 that plaintiff "still occasionally has burning on scalp [and] face/back." (*Id*.) However, Dr. Khasak found "no dermatological manifestations" and made an assessment of "psychoneuro dermatosis." (*Id*.) Dr. Khasak advised plaintiff to consult a psychiatrist. (*Id*.)

On May 25, 2002, plaintiff was admitted to the Charles C. Harris Skin and Cancer Unit at New York University Medical Center. Plaintiff was discharged that same day and the diagnosis at the time of discharge was "anxiety." (Pl.'s Aff. Ex. J.) On June 3, 2002, plaintiff also consulted with Dr. Andrew G. Franks, Jr., a dermatologist. (Pl.'s Aff. Ex. K.)

Plaintiff was initially seen by Dr. Marina Neystat, a neurologist, on July 22, 2002. Dr.

Neystat concluded that plaintiff's "subjective complaints are a result of somatization disorder, probably from underlying depression with psychotic features and symptoms and features of anxiety." (Wydysh Aff. Ex. K.) Dr. Neystat further noted that plaintiff "will greatly benefit from a psychiatric consult . . . to alleviate her symptoms, because I do believe that she is in great need of psychiatric help," and gave her Neurontin, a "good mood stabilizer." (*Id.*) On August 7, 2002, Dr. Neystat noted under "Diagnoses" that plaintiff suffered from "depression" and "somatization disorder." (*Id.*)

Plaintiff saw another neurologist, Dr. Richard Blanck, on September 3, 2002. After conducting a "detailed neurological examination," Dr. Blanck stated:

> Ms. Viscusi complains about chronic intermittent scalp burning. I am uncertain as to the exact etiology of her symptoms and signs, but currently I find no evidence to support the diagnosis of central or peripheral nervous system malfunction. I suspect that she may have a local inflammation of the scalp related to an allergic reaction to hair coloring dye as she suggests. She also has considerable anxiety about her problems which may be contributing to the genesis of her problems as well.

(Wydysh Aff. Ex. L.) Dr. Blanck also referred plaintiff to Dr. Brian Hainline, a neurologist specializing in chronic pain. (*Id.*) Dr. Hainline noted that although plaintiff "has neuropathic pain . . . from her reaction to the hair dye," there is no evidence of "any scalp or hair follicle damage," and he did "not suspect any type of reversible nerve damage." (Pl.'s Aff. Ex. A 2-3.)

Dr. Mark Gurtovy, a psychiatrist, began treating plaintiff on October 11, 2002. The "Behaviorial Health Evaluation" prepared by Dr. Gurtovy on October 11, 2002 noted that plaintiff's "chief complaint" was that she was "very depressed and anxious." (Wydysh Aff. Ex. M.) Plaintiff's symptoms consisted of "depressed mood," "little sleep," "concentration/memory problems," "panic attacks," and "anxiety." (*Id.*) Dr. Gurtovy's diagnoses, as of October 11, 2002, were depression and panic disorder agoraphobia. (*Id.*) On May 20, 2005, over two and one-half years after plaintiff's

treatment with Dr. Gurtovy began, Dr. Gurtovy's diagnosis of plaintiff remained panic disorder agoraphobia. (*Id.*)

4.  Dr. Leon Weinstein

Plaintiff proffers her "personal physician, Dr. Leon Weinstein," whom she first saw on April 26, 2002, complaining of "anxiety and palpitations," as an expert witness. (Wydysh Aff. Ex. E ¶ 22, Ex. G 37: 10, 49: 9.)  In a letter dated February 22, 2005, Dr. Weinstein states, in relevant part:

> Mary Viscusi dyed her hair with Clairol Nice 'N Easy on March 30, 2002.  The next day, March 31, 2002, as a result of using the dye she developed burning of the scalp, face, neck, eyes and upper back.  Rash and blisters were evident on her face and neck.  The physical and psychological consequences of what happened to her using the dye caused her irreparable harm and suffering.  She suffered nerve ending damage to her scalp, face, neck and upper back.

(Wydysh Aff. Ex. N.)

Dr. Weinstein received his Doctor of Medicine from Tashkent Medical Institute in 1984. (Wydysh Aff. Ex. G 12: 6, 20, 13: 1.)  Thereafter, he spent three years at Tashkent's Dermatology and Venereal Disease Institute studying venereal diseases and fungal infections.  (*Id.* at 14-15.)  At no time during his education did Dr. Weinstein study, or perform research on, the neurological implications of hair dye on the skin, the allergic potential of hair dye, or the allergic properties of hair dye on the skin.  (*Id.* at 13-14.)  Dr. Weinstein is not Board Certified, nor does he consider himself to be an expert in, dermatology, allergy, neurology, or epidemiology.  (*Id.* at 17, 23-27.)  Dr. Weinstein has never authored any publications on the relevant specialties, and has never been involved in "peer review" of publications by others on these specialties.  (*Id.* at 18- 19.)  He also has never been qualified as an expert in any court in dermatology, allergy, neurology or epidemiology, and has never provided testimony concerning hair dye, nor worked or consulted on a litigated matter

involving hair dye or allergic reactions to hair dye. (*Id.* at 28, 32.) Rather, Dr. Weinstein, an internist, practices as a "primary care physician," mostly treating chronic conditions such as diabetes and high blood pressure, as well as acute problems such as aches and colds, and his particular specialty is physical therapy. (*Id.* at 22: 4-18, 23: 13-21.) Finally, Dr. Weinstein did not inspect the hair dye used by plaintiff in this case, he did not read any scientific or professional publications concerning the possible negative effects of the use of hair dye, and he did not speak with any physicians who have experience treating allergic or neurological reactions to hair dye. (*Id.* at 34-35.)

In reaching his opinion that, "as a result of using the dye [plaintiff] developed burning of the scalp, face, neck, eyes and upper back," Dr. Weinstein relied upon the records contained in plaintiff's file, and the "patient's words and clinical examination only." (*Id.* at 9-10, 36: 11-12; Ex. N.) Dr. Weinstein never inspected either the hair dye used by plaintiff or plaintiff's scalp. He never observed either a rash or blister on plaintiff's face or neck, and he never conducted any experiments or tests in relation to plaintiff's claims of physical injury. (Wydysh Aff. Ex. G 34: 3-5, 35: 11-14, 36: 22-24, 37: 5, 38-39.) Moreover, Dr. Weinstein never conducted any psychological testing of plaintiff in reaching the opinion that the "psychological consequences of what happened to [plaintiff] using the dye caused her irreparable harm and suffering," nor did he perform any tests or nerve conduction studies in concluding that plaintiff had suffered nerve-ending damage. (*Id.* at 38-39, 46-48.)

Upon further questioning, Dr. Weinstein acknowledged that he relied on (1) Dr. Neystat's July 11, 2002 report, which states that plaintiff's subjective complaints are a result of the somatization disorder, recommends that plaintiff seek psychiatric consultation, and prescribes

Neurontin, and (2) Dr. Blanck's September 3, 2002 report, in formulating his opinion that plaintiff suffered "nerve ending damage." (*Id*. at 41: 3-10, 43: 12-19.) Based on Dr. Neystat's report, Dr. Weinstein "assume[d] [that Dr. Neystat] wanted to treat [plaintiff's] peripheral neuropathy . . . nerve ending damage," because neurontin is a "medication, which we usually use for peripheral neuropathy." (*Id*. at 41: 12-16, 42: 25, 43: 1.) Dr. Weinstein focused on the "clinical status," or "anxiety, nervousness, and depression," and the "subjective complaints" mentioned in Dr. Blanck's report in concluding that plaintiff had suffered nerve ending damage. (*Id*. at 45: 18-24.) However, Dr. Weinstein conceded that the results of both Dr. Neystat's and Dr. Blanck's neurological examinations of plaintiff were normal. (*Id*. at 42: 4-9, 45: 7-16.)

5.    Dr. Robert Reisman

_____Dr. Reisman, a Diplomate of the American Board of Allergy and Immunology, and the American Board of Internal Medicine, currently works as a Clinical Professor of Medicine/Pediatrics at the State University of New York at Buffalo, an Attending Allergist in the Department of Pediatrics, Allergy Division, at Children's Hospital of Buffalo, and an Attending Physician at Buffalo General Hospital. (Reisman Aff. ¶¶ 2-4.) He possesses over forty years of experience in the diagnosis and treatment of allergies and the identification of allergens in patients, and, in particular, has treated patients who have experienced allergic reactions following the use of consumer hair coloring products. (*Id*. at ¶ 5.) It is Dr. Reisman's opinion that plaintiff's description of her reaction following use of the product – itching, burning of the skin, blisters and redness - is typical of a contact allergy. (*Id*. at ¶¶ 8, 20(a).) Such reaction, however, would only be expected in areas where the hair dye came into contact with the skin. (*Id*. at ¶¶ 8, 20(b).) Moreover, a contact allergic reaction from hair dye is typically avoided by performing an allergy test forty-eight hours

prior to application of the dye; it is "highly unusual for a person to have a negative allergy test and to then sustain an allergic reaction from use of a hair dye." (*Id*. at ¶¶ 11, 20(e).) Finally, based on a review of the record in the instant action, Dr. Reisman concluded: "I know of no medical information which indicates that persistent or long-term duration of skin 'itching' or 'burning' is a complication or sequelae of contact dermatitis. There is no medical evidence that Plaintiff sustained any 'nerve ending damage' as a result of her use of the product. Such an injury is not a complication or sequalae of contact dermatitis." (*Id*. at ¶¶ 20(f), (g).)

6.   Procedural History

Plaintiff filed the complaint in this action in New York State Supreme Court, Queens County, on February 25, 2005. On March 24, 2005, defendant removed the action to this court. The parties engaged in discovery, and the instant motions followed.

## Discussion

## I.   Admissibility of Expert Testimony

### A.   Applicable Law

Federal Rule of Evidence 104(a) provides that the admissibility of expert testimony is a preliminary question of law for the court to determine. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The proponent of the testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence. *See Berk v. St. Vincent's Hosp. and Med. Ctr.,* 380 F. Supp. 2d 334, 349 (S.D.N.Y. 2005) (citations omitted). In *Daubert*, the Supreme Court explained that the trial judge must perform a "gatekeeping" function to ensure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. It is, therefore, proper for district courts to screen out inadmissible expert

testimony on summary judgment:

> Because the purpose of summary judgment is to weed out cases in which "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court.

*Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (internal citations and footnotes omitted). This is true even if the exclusion of expert testimony would be outcome-determinative. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142-43, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (rejecting "[the] argument that because the granting of summary judgment in [a] case [may be] 'outcome determinative,' [the exclusion of expert testimony] should [be] subjected to a more searching standard of review.").

While Rule 104(a) addresses the admissibility of evidence generally, the admissibility of expert testimony is specifically governed by Rule 702 of the Federal Rules of Evidence. *See Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Rule 702 lays out a three-step inquiry to determine whether the testimony of a party's proffered expert should be deemed admissible. First, the court must review the relevance of the proposed expert's testimony to determine whether the conclusions it draws will aid the factfinder in answering the questions at issue in the case. *Berk*, 380 F. Supp. 2d at 350. Here, the relevance

of Dr. Weinstein's testimony is not in dispute. Second, the court must investigate the expert's compliance with the provision of Fed. R. Evid. 702 that requires an expert to be "qualified as an expert by knowledge, skill, experience, training or education." *See also Nimely*, 414 F.3d at 395 n. 11 ("The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on [his or her] perception.'") (quoting *United States v. Garcia*, 291 F.3d 127, 139 & n.8 (2d Cir. 2002)). However, given that rejection of expert testimony is "the exception rather than the rule," courts have been reluctant to exclude an expert merely on the grounds that he or she is unqualified. *E.E.O.C. v. Morgan Stanley & Co.,* 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004) (citing Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendments)); *see also Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citation omitted). Third, the court must inquire "whether a proffered expert opinion has the required indicia of scientific reliability." *Nimely*, 414 F.3d at 396 (citing *Daubert*, 509 U.S. at 593-94).

To be reliable, expert testimony must be based on sufficient facts or data, and it must be the product of reliable principles or methods properly applied. The court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). In other words, expert testimony should be excluded if it is "speculative or conjectural," or if is based on assumptions that are "'so unrealistic and contradictory as to suggest

bad faith' or to be in essence an 'apples and oranges comparison.'" *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d. Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.,* 727 F. 2d 202, 208 (2d Cir. 1984)). An expert's opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert," for a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. ,* 522 U.S. 136 at 146 (citation omitted); a*ccord* Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendments) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'") (citation omitted).

The trial court has latitude in deciding how to test an expert's reliability. *Daubert* listed a number of factors, but this "list of factors was meant to be helpful, not definitive." *Kumho Tire Co., Ltd.,* 526 U.S. at 151. The factors that a trial court *may* consider include, among others: (1) whether a theory or technique relied on by an expert can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error; (4) whether the theory or technique has been generally accepted in the relevant community; (5) whether the discipline itself lacks reliability; (6) whether an expert's methodology is experience-based, whether the methodology has produced erroneous results in the past and whether the methodology has been generally accepted in the relevant community; and (7) whether an expert's method is a kind that others in the field would recognize as acceptable. *See Daubert,* 509 U.S. at 593; *Kumho Tire Co., Ltd.,* 526 U.S. at 151.

The reliability requirements do not preclude an expert from testifying on the basis of his experience alone or in conjunction with other knowledge, training, skill or education. *See* Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendments) ("[E]xperience . . . may [ ] provide a sufficient foundation for expert testimony."). However, an expert basing his opinion solely on

experience must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. Finally, courts have admitted expert testimony from medical doctors based on their examination and treatment of a patient's condition. *See, e.g., Santoro v. Signature Constr., Inc.,* No. 00 Civ. 4595, 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002) ("[T]reating physicians have routinely been permitted to testify to determinations that they made in the course of providing treatment regarding the cause of an injury and its severity.").

### B.     Dr. Leon Weinstein

The court finds Dr. Weinstein insufficiently qualified to offer any expert opinion on the subject about which he intends to testify – the cause of plaintiff's alleged physical and psychological injuries.  Although it is rare for a court to exclude expert testimony on the grounds that the proffered witness is unqualified, a "district court may properly conclude that [a] witness[ ] [is] insufficiently qualified. . .  because [his] expertise is too general or too deficient." *Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81 (2d Cir. 1997).  Here, Dr. Weinstein, an internist, practices as a "primary care physician," mostly treating chronic diseases such as diabetes and high blood pressure, as well as acute problems such as aches and colds, and his specialty is physical therapy.  (Wydysh Aff. Ex. G 22: 4-18. 23: 13-21.)  He is not Board Certified in, nor does he consider himself to be an expert of, the specialties most relevant to the instant matter, namely, dermatology, allergy, neurology or epidemiology.  (*Id*. at 17, 23-27.)  As such, Dr. Weinstein has never authored any publications on the relevant specialties, and has never been involved in "peer review" of publications by others on these specialties.  (*Id.* at 18- 19.)   He also has never been qualified as an expert, in any court, in dermatology, allergy, neurology or epidemiology.  (*Id*. at 28.)  Furthermore, with respect to hair dye

in particular, Dr. Weinstein has never studied, nor performed research on, the neurological implications of hair dye on the skin, the allergic potential of hair dye, or the allergic properties of hair dye on the skin. (*Id*. at 13-14.) He has never provided testimony concerning hair dye, nor worked or consulted on a litigated matter involving hair dye or allergic reactions to hair dye. (*Id*. at 32.) Finally, not only do Dr. Weinstein's training and experience render him unqualified to offer expert testimony on the cause of plaintiff's alleged injuries, he also failed to sufficiently educate himself about the product and its potential health risks. He did not inspect the hair dye used by plaintiff in this case. He did not read any scientific or professional publications concerning the possible negative effects of the use of hair dye, nor did he speak with any physicians experienced in treating allergic or neurological reactions to hair dye. (*Id*. at 34-35.)

Furthermore, subjecting Dr. Weinstein's opinions to *Daubert* scrutiny immediately exposes their unreliability, for nothing in his report explains the reasoning or methodology by which he reaches them. Dr. Weinstein states in his report that "as a result of using the dye [plaintiff] developed burning of the scalp, face, neck, eyes and upper back. Rash and blisters were evident on her face and neck." (Wydysh Aff. Ex. N.) However, it is clear from the record that Dr. Weinstein made no effort to validate this opinion. He never inspected plaintiff's scalp. He never observed either a rash or blister on plaintiff's face or neck, nor did he ever conduct experiments or tests in relation to plaintiff's claims of physical injury. (Wydysh Aff. Ex. G 34: 3-5, 35: 11-14, 36: 22-24, 37: 5, 38-39.) Rather, he merely relied upon the records contained in plaintiff's file and the "patient's words and clinical examination only." (*Id*. at 9-10, 36: 11-12.) Similarly, Dr. Weinstein did not perform any tests or nerve conduction studies in formulating his opinion that plaintiff "suffered nerve ending damage to her scalp, face, neck and upper back." (*Id*. at 38-39; Ex. N.)

Instead, he extrapolated from Dr. Neystat's July 11, 2002 report that she had "wanted to treat [plaintiff's] peripheral neuropathy . . . nerve ending damage" because she prescribed plaintiff Neurontin, a "medication, which we usually use for peripheral neuropathy," and focused on the "subjective complaints" mentioned in Dr. Blanck's report, in concluding that plaintiff had suffered nerve ending damage. (Wydysh Aff. Ex. G 41: 12-16, 42: 25, 43: 1, 45: 18-24.) Dr. Weinstein concedes, however, that the results of both Dr. Neystat's and Dr. Blanck's neurological examinations of plaintiff were normal. (*Id*. at 42: 4-9, 45: 7-16.) Finally, Dr. Weinstein never conducted any psychological testing of plaintiff in reaching the opinion that the "psychological consequences of what happened to [plaintiff] using the dye caused her irreparable harm and suffering." (*Id*. at 46-48.)

Accordingly, plaintiff is precluded from relying on Dr. Weinstein's report and related testimony because, not only is he unqualified to testify in the instant matter, his opinions are utterly unreliable.

## II.    Defendant's Summary Judgment Motion

### A.    Governing Law

In a diversity action, a district court looks to the choice-of-law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); *Jackson v. Domtar Indus., Inc.,* 35 F. 3d 89, 92 (2d Cir. 1994). In the tort context, New York courts apply an "interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Properties Corp.,* 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994) (discussing the choice-of-law rules originally formulated in *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279 (1963)). Under *Babcock*'s choice-of-law analysis, rules of law that regulate conduct giving rise to a cause of action,

such as the duty and standard of care applicable to manufacturers, are generally supplied by the place where the tort occurred because the state has "the greatest interest in regulating behavior within its borders." *Id*. (citation omitted). Here, plaintiff is a resident of New York, defendant sold the product to plaintiff in New York, and the incident at issue took place in New York. While incorporated in Ohio, Clairol conducts business in New York and is subject to jurisdiction here. It follows, therefore, and the parties do not dispute, that this action is governed by New York law.

### B.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* - - - U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*. at 1776.

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the

evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1998)).

In actions in which one of the parties appears *pro se*, the court is faced with the additional responsibility of granting significant liberality in how *pro se* pleadings are construed. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (*per curiam*) (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *accord Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [the *pro se* party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment. *See Lee v. Coughlin,* 902 F. Supp. 424, 429 (S.D.N.Y. 1995) ("a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment.").

Construing plaintiff's complaint liberally due to her special status as a *pro se* litigant, plaintiff appears to be raising claims of strict products liability, negligence, and breach of warranty. The court will address each claim in turn.[1]

---

[1]Defendant contends that its "statement of undisputed material facts" are "deemed to be admitted for purposes of the motion" because plaintiff failed to comply with Local Civil Rule 56.1, which mandates, in relevant part, that "the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and, if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1. Defendant further contends that plaintiff's failure to submit a memorandum of law "setting forth the points and authorities relied upon . . . in opposition to the motion . . . may be deemed sufficient cause for . . . the granting of [Clairol's] motion by default." Local Rule 7.1. However, the court will exercise its discretion to decide the motion on the record submitted, given plaintiff's *pro se* status, and her

### C.    New York Products Liability Law

#### 1.    Strict Products Liability

"A manufacturer who places into the stream of commerce a defective product which causes injury may be held strictly liable." *Amatulli v. Delhi Const. Corp.,* 77 N.Y.2d 525, 532, 569 N.Y.S.2d 337, 571 N.E.2d 645 (1991). Under New York law, there are three distinct claims for strict products liability: (1) a design defect, which results when the product as designed is unreasonably dangerous for its intended use; (2) a manufacturing defect, which results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm; (3) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 154 (2d Cir. 1997).

##### a)    Design Defect

To prevail on a theory of improper design, a plaintiff must present evidence that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury. *See Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 107-08, 450 N.Ed.2d 204, 463 N.Y.S.2d 398 (1983). The first two prongs, grouped together, are often referred to as the risk-utility balancing test, and are used to determine whether a product is defective or "unreasonably dangerous." *See Anderson v. Hedstrom Corp.,* 76 F. Supp. 2d 422, 454 (S.D.N.Y. 1999) (citing *Cover v. Cohen,* 61 N.Y.2d 261, 266-67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984)). The New York Court of Appeals

---

effort to oppose defendant's motion by submitting an affidavit with attached exhibits. For the same reason, defendant's "statement of undisputed material facts" is not deemed admitted.

enumerated the following factors to be applied in the risk-utility balancing test:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product -- that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

*Voss*, 59 N.Y.2d at 109.

It is an understatement to say that the wholesale exclusion of Dr. Weinstein's testimony regarding the cause of plaintiff's alleged injuries significantly impacts Ms. Viscusi's case. Nevertheless, viewing the evidence in a light most favorable to plaintiff, genuine issues of material fact remain with respect to whether plaintiff sustained an allergic reaction as a result of using the product due to: (1) Dr. Khasak's report dated May 7, 2002, which states that plaintiff "still occasionally has burning on scalp [and] face/back," even though Dr. Khasak found "no dermatological manifestations" and made an assessment of "psychoneuro dermatosis;" (2) Dr. Blanck's report dated September 3, 2002, which states, "I suspect that [plaintiff] may have a local inflammation of the scalp related to an allergic reaction to hair coloring dye as she suggests;" and (3) Dr. Haidline's report which states that plaintiff "has neuropathic pain . . . from her reaction to hair dye," even though Dr. Haidline found no evidence of "any scalp or hair follicle damage, . . . [or] any type of reversible nerve damage." (Wydysh Aff. Exs. J; L; Pl.'s Aff. Ex. A at 2-3.) Plaintiff's evidence relating to her alleged injuries, however, without more, is simply insufficient to set forth a basis for strict liability on the part of defendant in the design of the product. *See Clarke v. Helene Curtis, Inc.,* 293 A.D.2d 701, 701-02, 742 N.Y.S.2d 325 (2d Dep't 2002) ("The cornerstone rule in products liability is that proof of mere injury furnishes no rational basis for inferring that the product

was defective for its intended use.") (quoting *Helene Curtis Indus. v. Pruitt*, 385 F.2d 841, 853 (5th Cir. 1967), *cert. denied*, 391 U.S. 913, 88 S. Ct. 1806, 20 L. Ed. 2d 652 (1968)).

The utility of hair dyes, such as the one at issue here, is clear, given that they are used by millions of people to alter their hair color. The colorants contained in the product, as contact dermal allergens, may cause contact dermatitis; however, allergic reactions among users of the product are rare, usually mild, and limited to those areas of the skin with which the dye comes into contact. (Kaminsky Aff. ¶¶ 10-12.) For instance, out of the 24,508,300 units of Clairol Nice 'N Easy sold in 2001, Clairol only received 665 consumer reports of alleged allergic reactions following the use of the product (1 reported allergic reaction per 36,855 units sold), none of which have been medically verified by defendant. (Schlosser Aff. ¶¶ 5, 6.) Furthermore, the proper performance of a pre-application allergy test, as described in the instructions provided with the product, will typically prevent the occurrence of most allergic reactions. (Kaminsky Aff ¶¶ 14-15.) Although plaintiff claims to have performed the allergy test forty-eight hours prior to applying the product to her hair, and to have suffered no allergic reaction, it is highly unusual to have a negative allergy test and then to sustain an allergic reaction from use of the hair dye. (Reisman Aff. ¶¶ 11, 20(e).) Finally, plaintiff has not suggested the existence of a safer, but reasonable, alternative design. *See Sabater v. Lead Indus. Ass'n, Inc.*, 183 Misc.2d 759, 764-65, 704 N.Y.S.2d 800 (Sup. Ct. Bronx Co. 2000) (granting defendant's motion to dismiss plaintiff's claim for design defect for failure to establish a safer alternative); *see also Burgos v. Lutz*, 128 A.D.2d 496, 497-98, 512 N.Y.S.2d 424 (2d Dep't 1987) ("The plaintiff having failed to present such proof [of a feasible alternative design which would have avoided the harm], a prima facie case was not established with respect to the claim of a defective designed steering column."). In any event, the ingredients contained in the product,

namely p-phenylenediamine and n, n, - bis(2-hydroxyethyl)-p-phenylenediamine, are widely used in the cosmetic hair industry and have a history of safe use. According to Dr. Kaminsky, the minimal risk of allergic reaction to the hair colorants contained in the product and the minimal potential for injury when such an allergic reaction occurs is an "acceptable toxicological risk." (Kaminsky Aff. ¶¶ 21(c), (d).)

        b)      <u>Manufacturing Defect</u>

_____To utilize this theory, a plaintiff must show that the product unit was defective as a result of "some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction," and that the defect was the cause of plaintiff's injury. *Caprara v. Chrystler Corp.,* 52 N.Y.2d 114, 129, 436 N.Y.S.2d 251, 417 N.E.2d 545 (1981).

Here, plaintiff has failed to establish a basis for strict liability on the part of defendant in manufacturing the product. In her complaint, plaintiff alleges that the product was "tainted." (Wydysh Aff. Ex. A. ¶¶ 1, 3.) However, plaintiff does not claim that the formulation of the product deviates in any way from defendant's intended formulation, and possesses no proof that the product did so differ. Plaintiff also alleges that the product contained "toxic substances that were hazardous and injurious to plaintiff." (*Id*. at ¶ 8.) However, plaintiff fails to state which of the ingredients used by defendant in manufacturing the product are defective, or how such ingredients are defective. Moreover, the record makes clear that the ingredients contained in the product are conventional and widely used hair colorants contained in virtually all consumer permanent hair dyes. (Kaminsky Aff. ¶ 9.) As such, plaintiff's conclusory allegations are insufficient to defeat defendant's motion for summary judgment on the manufacturing defect claim. *See Kerzer*, 156 F.3d at 400.

c)      <u>Failure to Warn</u>

A failure to warn claimant must show (1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm. *See Colon v. Bic USA, Inc.,* 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001).  Failure to warn is typically a fact-intensive inquiry for the jury to decide.  *See Liriano v. Hobart Corp.,* 92 N.Y.2d 233, 242, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998).  However, a court may deny a failure to warn claim as a matter of law where, as here, only one conclusion can be drawn from the established facts.  *See id*.

Plaintiff's failure to warn claim fails because not only did defendant satisfactorily instruct the user about dangers resulting from foreseeable uses in the product, but plaintiff has failed to set forth expert proof showing a causal link between the allegedly inadequate warnings and her injuries. The instructions provided with the product clearly advise the user of the potential for an allergic reaction as a result of using the product.  Specifically, the instructions provide: "Just as some people are allergic to foods and medicines, a small number of people may show an allergic reaction to hair colorants.  So, to help minimize the risk, it is important to perform the skin allergy test 48 hours prior to **every** application." (Wydysh Aff. Ex. H) (emphasis in orignial.)  After detailing how to perform the allergy test, the instructions further provide: "If no reaction occurs, you are ready to color. **If a rash or redness, burning or itching occurs you may be allergic and you must not use this product**."  (*Id*) (emphasis in original.)  Moreover, plaintiff claims to have read all of the instructions/warnings prior to using the product, and to have performed the allergy test, as set forth in the instructions, at approximately 9:00 a.m. on March 28, 2002, forty-eight hours before applying the product to her hair.  (Wydysh Aff. Ex. E ¶¶ 3, 10; Ex. F 16: 7-11, 19: 5-14.)  Finally, plaintiff

failed to offer any proof that additional warnings or instructions would have increased her awareness of the potential foreseeable dangers and, thus, have prevented her injuries.

### 2.    Negligence

To make out a prima facie case for negligence in New York, a plaintiff must show (1) that the manufacturer owed plaintiff a duty to exercise reasonable care; (2) a breach of that duty by failure to use reasonable care so that a product is rendered defective, *i.e.* reasonably certain to be dangerous; (3) that the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage.  *See McCarthy,* 119 F.3d at 156; *Cacciola v. Selco Balers, Inc.,* 127 F. Supp. 2d 175, 185 (E.D.N.Y. 2001).

The determination that defendant did not defectively design the product essentially disposes of plaintiff's negligence claim because "[i]n general . . . the strict liability concept of 'defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing." *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 63 (2d Cir. 2002) (quoting *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995), *aff'd* 79 F.3d 12 (2d Cir. 1996)). Accordingly, for the reasons set forth above, summary judgment is appropriate on plaintiff's negligence claim.

### 3.    Breach of Implied Warranty

In the sale of goods context, there is an implied warranty that the goods will be of merchantable quality.  *Prohaska v. Sofamor, S.N.C.,* 138 F. Supp. 2d 422, 448 (W.D.N.Y. 2001); *see also Denny,* 87 N.Y.2d at 258 (citing section 2-314(2)(c) of the Uniform Commercial Code and noting its "continued validity in New York.").  This warranty, however, does not mean that the product will fulfill a "buyer's every expectation."  *Denny*, 87 N.Y.2d at 259 (citation omitted).

Rather, such a warranty "provides for a minimum level of quality." *Id.*

Despite plaintiff's allegations that she sustained an allergic reaction as a result of using Clairol Nice 'N Easy to color her hair, plaintiff has failed to establish that the product was unfit for its intended purpose of coloring hair. *See Pai v. Springs Indus., Inc.*, 18 A.D.3d 529, 531, 795 N.Y.S.2d 98 (2d Dep't. 2005) ("When a product is widely sold and easily purchased, 'the mere fact that an infinitesimal number experienced a discomforting reaction is not sufficient to establish that the product was not fit for the purposes intended.'"). Plaintiff's breach of implied warranty claim is therefore dismissed.

## Conclusion

For the reasons set forth above, the court grants defendant's motion to exclude expert testimony and motion for summary judgment. Plaintiff's complaint is dismissed without costs to either party.

SO ORDERED.

DATED:     Brooklyn, New York
           July 16, 2007


_____/s/_____
DORA L. IRIZARRY
United States District Judge